

FILED

Feb 22 2019, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch, II
Boren Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Meghan E. Price,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 22, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1513<br><br>Appeal from the Morgan Circuit<br>Court<br><br>The Honorable Matthew G.<br>Hanson, Judge<br><br>Trial Court Cause No.<br>55C01-1706-F1-1253 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Meghan Price (Price), appeals her conviction for neglect of a dependent resulting in death, a Level 1 felony, Ind. Code § 35-46-1-4(b)(3).

We affirm.

# ISSUE

Price presents one issue on appeal, which we restate as: Whether the trial court abused its discretion by admitting certain evidence.

# FACTS AND PROCEDURAL HISTORY

Price's son, B.P., was on born in June 2011. As an infant, B.P. exhibited difficulties in gaining weight and had developmental delays. Subsequent genetic testing revealed that B.P.'s developmental delays were attributed to a condition called Fragile X chromosome. Fragile X is an indicator of autism, and it is associated with lack of impulse control, disruptive behavior, and aggressiveness. Significant developmental delays followed with B.P.'s speech being limited to single words until age four, followed by a limited vocabulary of approximately 25 words. B.P. also had a history of self-injurious behavior.

On July 14, 2014, an officer from the Morgan County Sheriff's Department was dispatched to Price's residence after receiving a report of a domestic dispute. Price informed the officer that B.P. had incurred some bruising while in the care of her boyfriend, Steven Ingalls (Ingalls). Ingalls was not present when the officer arrived. During the visit, the officer noted that B.P. had a scratch above

his ear, a bruise to the right side of his forehead, and a purple bruise on his cheek. Price indicated that the domestic dispute resulted following a verbal altercation with Ingalls regarding B.P.'s injuries. After taking pictures of B.P.'s injuries, the officer left but reported the incident to the Department of Child Services (DCS). Price thereafter notified her family members and friends that Ingalls had moved out and she did not intend on dating him again. A few months later, Price and Ingalls resumed their relationship.

[6] On November 18, 2015, Price called St. Vincent Hospital pediatric emergency department claiming that B.P. had ingested an unknown substance at a grocery store, had dilated eyes, and a low heart rate. Price stated that she was on her way to the hospital. Ingalls went with Price. While treating B.P., the attending nurse instructed Price to change B.P. into a gown. As the nurse was inquiring about B.P.'s medical history, she noticed that B.P. had "quite a bit of scratches on his face and neck and bruising all over his body." (Tr. Vol. VIII, p. 57). Based on B.P.'s injuries, the attending nurse contacted a social worker, who in turn interviewed Ingalls and Price. During the interview, Ingalls was "dismissive," and at "one point, he stormed out of the room" but later returned to finish the child abuse assessment. (Tr. Vol. VIII, p. 43).

[7] On December 1, 2015, B.P. began preschool at Waverly Elementary School. On B.P.'s third day of school, Price informed the teacher that B.P. had injured his penis with his zipper. While changing B.P.'s diaper that day, the teacher observed the head of B.P.'s penis "was extremely bruised." (Tr. Vol. VI, p. 50). As the school year progressed, B.P. missed school with unexcused absences on

twenty-five days. B.P. would return from those absences with new injuries, and Price would offer an explanation. The school nurse documented B.P.'s injuries as follows: multiple bruises on December 15, 2015; a large knot on his head on February 1, 2016; various bruises on his head including a "large green bruise on left forehead with a large knot" and eyelid bruising on February 11, 2016; bruises "all over [the] sides [of his] head" and other bruises all over his body "in various stages of healing" on March 3, 2016. (State's Ex. Vol. II, p.160). In February 2016 and March 2016, the school contacted DCS about the injuries.

[8] In the fall semester of 2016, B.P. had a total of nineteen absences. The school nurse continued to document B.P.'s injuries: Pinch marks all over his penis; pinch like "bruise on his left ear," and "busted lip." (State's Ex. Vol. II, p.160). In September 2016, B.P. was treated for a broken arm and for a face laceration. The school bus driver also saw Price threaten "to pop [B.P.] right in the mouth" for using foul language. (Tr. Vol. VI, p. 79). In October 2016, B.P. was withdrawn from the school. Price conveyed to a friend that she was homeschooling B.P. since she was "over the crap" of B.P.'s school reporting her to DCS regarding B.P.'s injuries. (Tr. Vol. V, p. 187).

[9] On November 8, 2016, B.P. was seen at St. Vincent Hospital for a lip laceration and underwent surgery two days later. On November 15, 2016, Price took B.P to St. Vincent Hospital yet again since he was having trouble breathing. The treating physician did not observe breathing difficulties in B.P., but he noticed that B.P. had bruising underneath both eyes. During a follow up appointment on November 22, 2016, B.P. was diagnosed with asthma and a sinus infection.

On November 23, 2016, at approximately 10:00 a.m., an unidentified male voice called 911 and reported that there was an unconscious, unresponsive child that was not breathing at Price's apartment. Moments later, emergency trained technicians (EMTs), firefighters, and police arrived at Price's apartment building. Ingalls was observed "walking around" like a "complete bystander" with "no emotion" holding his infant son and B.P.'s younger brother. (Tr. Vol. IV, pp. 134-35). EMTs then heard someone yell for help inside the building. The EMTs found B.P. who was unconscious at the bottom of the common stairway. When the EMTs asked Price what had happened, Price said that B.P. went to bed at 8:30 p.m. the night before, and that shortly before 911 was called, she checked on him and found him unresponsive.

The EMTs attempted CPR but were unable to open B.P.'s jaw. After efforts to set up an airway failed, they placed an oxygen mask over B.P.'s mouth and nose. One of the EMTs then picked up B.P. and carried him to the ambulance. Inside the ambulance, the EMTs inserted an IV and gave B.P. one dose of "epinephrine," and they arrived at the hospital shortly thereafter. (Tr. Vol. IV, p. 138).

Detective Chad Richhart (Detective Richhart) of the Mooresville Police Department arrived as the ambulance was leaving with B.P. Because Price and Ingalls could not ride with B.P. in the ambulance, Detective Richhart and another officer transported them to the hospital. Price was barefoot, and she went back to the apartment to retrieve her shoes before going to the hospital. Price's neighbor, Tiffany Hall, Ingalls, and Detective Richhart followed Price to

the apartment. Detective Richhart stood by the apartment's doorway. While waiting for Price to get ready, Detective Richhart "saw [Price] once or twice come up and down the hallway [and] into the living room" and ask Ingalls "where is the camera card, where is the camera card?" (Tr. Vol. VII, p. 133). Detective Richhart rode with Ingalls, while Price rode with the other officer to the hospital.

[13] At the hospital, Price and Ingalls made inconsistent statements regarding B.P.'s mouth injury and when B.P. was last seen in his normal state. For example, Price informed a family friend at the hospital that "when the EMTs tried to intubate [B.P] . . . they ripped his lip open." (Tr. Vol. V, p. 236). Price later informed that same friend that she had found B.P. "unresponsive, hanging over the side of his bed," and that she carried him to the living room and then "used a flathead screwdriver to pry his mouth open so she could" administer CPR on him. (Tr. Vol. VI, pp. 9-10).

[14] As soon as Detective Richhart dropped Ingalls off at the hospital, he went back to the apartment. After briefly talking to another officer at the scene, Detective Richhart determined that Price's apartment was not secure. Also, Detective Richhart hoped that the walkthrough could be helpful to detect any apparent dangerous substances that B.P. might have ingested, and he intended to convey that information to the doctors who were treating B.P. During his walkthrough, Detective Richhart saw some blood on the bedding in B.P.'s bedroom, and on the bedroom floor carpet. Shortly thereafter, Detective Richhart and the other officer exited Price's apartment. At approximately

10:38 a.m., Detective Richhart received a call from the hospital that B.P. had died.

[15]     Detective Richhart instructed another officer to seek a search warrant for the apartment. After the warrant was issued, the officers began processing Price's apartment for evidence. In B.P.'s bedroom, the officers found a blood spot on the carpet, and inside the closet. They recovered a "green pillow that also had some blood and a greenish fluid" which seemed like vomit. (Tr. Vol. IV, p. 187). The officers also found a flathead screwdriver on a table that had blood. The officers also documented the medications in the apartment and counted the pills.

[16]     At around 11:00 a.m., Ingalls and Price returned to the apartment, and Price was furious that the officers were conducting a search of her apartment and could not let her inside. While searching B.P.'s bedroom, the officers located a camera by B.P.'s bed. Detective Richhart went outside and asked Price how the camera worked, and Price said that it "sort of" ran "like a monitor" and that it recorded video footage and sent it to "an app" on Price's cellphone. (Tr. Vol. VII, p. 140). Detective Richhart asked Price if he could have her phone, and Price indicated that it was in the house. Detective Richhart eventually found Price's cellphone in Price's bedroom, but it had no power. Detective Richhart took the phone to Price, who was sitting outside the apartment in a vehicle, to seek help.

[17] After the phone had powered, Price informed Detective Richhart that she needed to check several things on her phone. Detective Richhart informed Price that he "didn't want her accessing the phone at that time." (Tr. Vol. VII, p. 142). After about "twenty or thirty seconds" of Price "actively . . . hitting the screen," Detective Richhart reached into the car and grabbed the cellphone from Price. (Tr. Vol. VII, p. 142). Detective Richhart then ordered another officer to obtain a warrant to search Price's cellphone.

[18] B.P.'s autopsy revealed that he was a "very frail" five-year-old weighing about thirty-five pounds. (Tr. Vol. V, p. 133). B.P.'s cause of death was determined to be asphyxiation and the effects of elevated levels of several medications. The toxicology report revealed that B.P. had "very elevated levels" of two medications—Sertraline and Clonidine. Sertraline is an antidepressant which, in high doses, can cause "depression of the respiratory system." (Tr. Vol. V, p. 103). Clonidine is a blood pressure medication which treats anxiety and it can cause the lowering of "blood pressure." (Tr. Vol. V, p. 103). Also, the toxicology report showed that Risperidone, a prescribed drug that treats schizophrenia, was found in B.P.'s body. When the three drugs are used together, they can cause drowsiness, sleepiness, and low blood pressure.

[19] By another search warrant, Price's phone was searched. There were several texts messages between Price and Ingalls. On November 12, 2016, two weeks before B.P. died, Price and Ingalls exchanged a long series of text messages that discussed B.P. Ingalls wrote to Price stating

I hate your son, he is nothing but a troublemaking worthless excuse for a retard[] down to his DNA core malnutritioned ugly should[']ve been cum stain that needs to rot in a mental institution playing with his own feces and pissing on himself while the nursing staff beats him until he's deaf dumb and motionless. I want to buy a ticket to the moment he takes his last breath, so I can be the last thing he sees as I rip his jawbone off of his face and personally cut his brainstem in half just to make sure not one more stupid fucking thought processes in his two-celled fucking brain. He'll never have a dad bc no one in their right fucking mind will ever stay around more than 5 minutes around that fucked up kid that [can't] go 2 days without bashing his own face into [] whatever he can so mommy will love on him. Lol, kill him while he's young and do something with your life before he robs you of any chance of ever being happy or being anything other than a stay at home [retard] caretaker.

(State's Exh.140). In response, Price wrote

He's not ruining my life, [I'll] run for the fucking hills before [I] stay stressed my entire life or kill him in such a violent way that the news can't even describe the scene without throwing up. I'm not going to prison over that little scrawny hand-flapper.

(State's Exh.145). Two days after Price sent the above text to Ingalls, she conducted an internet search on her phone for information about Risperidone overdose. DNA testing also revealed that the blood spots found on the green pillow and carpet belonged to B.P. B.P.'s DNA was also found on the flathead screwdriver found inside Price's home.

[20] On June 23, 2017, the State filed an Information, charging Price with Count I, conspiracy to commit murder, a Level 1 felony; Count II, neglect of a

dependent resulting in death, a Level 1 felony; and Count III, neglect of a dependent resulting in bodily injury, a Class C felony. The State later amended the charges to Count I, conspiracy to commit murder, a Level 1 felony; Count II, neglect of a dependent resulting in death, a Level 1 felony; and Count III, neglect of a dependent resulting in serious bodily injury, a Level 3 felony. The State later dismissed the Level 1 felony conspiracy to commit murder. [1]

[21] On May 25, 2018, Price filed a motion to suppress evidence from the search of her apartment and the search of her cell phone. Price argued that the search warrant for the apartment was obtained based on information learned during an unlawful walk-through of the apartment. With regard to the phone, Price argued it was improperly seized and the search warrant was not supported by probable cause. On May 26, 2018, the State filed a responsive motion, and after an evidentiary hearing, the trial court denied Price's motion.

[22] A jury trial was held on June 1 through June 12, 2018. At trial, Price renewed her motion to suppress but it was denied. At the close of the evidence, Price was found guilty of Level 1 felony neglect of a dependent resulting in death and Level 3 felony neglect of a dependent resulting in serious bodily injury. On June 26, 2016, the trial court conducted a sentencing hearing, merged the Level 3 felony neglect of a dependent resulting in serious bodily injury into the Level

---

[1] Initially, the State had alleged that the Class C felony offense was committed between January 1, 2014 and June 30, 2014. However, in the amended Information, the State changed the dates, alleging that the neglect of a dependent resulting in bodily injury occurred between July 1, 2014 and November 23, 2016.

1 felony neglect of a dependent resulting in death. The trial court then sentenced Price to a term of thirty-six years in the Department of Correction.

Price now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Price argues that the trial court abused its discretion by denying her motion to suppress evidence obtained from the search of her apartment and her cellphone, arguing that both searches violated her Fourth Amendment rights under the United State Constitution.[2] Although Price originally challenged the admission of the evidence through a motion to suppress, she appeals following a completed trial and challenges the admission of such evidence at trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Lanham v. State*, 937 N.E.2d 419, 421-22 (Ind. Ct. App. 2010). The admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004), *trans. denied*. We will reverse a trial court's decision only for an abuse of discretion. *Id*. An abuse of discretion occurs

---

[2] Price also asserts that search of her apartment and seizure and search of her phone violated her rights under Article 1, Section 11, of the Indiana Constitution. However, Price fails develop her argument, and it is therefore waived. Ind. Appellate Rule 46(A)(8)(a), *see* also, *Francis v. State*, 764 N.E.2d 641, 646-47 (Ind. Ct. App. 2002) (notes that Indiana courts interpret and apply Article I, Section 11 independently from federal Fourth Amendment jurisprudence and failure by a defendant to provide separate analysis waives any claim of error).

when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

## II. *Initial Entry to Price's Apartment*

The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The fundamental purpose of the Fourth Amendment 'is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings.'" *Hines v. State*, 981 N.E.2d 150, 153 (Ind. Ct. App. 2013).

Here, Price argues that Detective Richhart violated her Fourth Amendment rights by conducting a warrantless entry of her apartment. The State responds by stating that the "brief walk-through of the residence was permitted pursuant to the exception for exigent circumstances" and the warrant requirement was therefore "inapplicable." (Appellees' Br. pp. 26-27). We agree.

> [S]earches or seizures inside a home without a warrant are presumptively unreasonable. "However, 'on occasion the public interest demands greater flexibility than is offered by the constitutional mandate' of the warrant requirement." Accordingly, there are some carefully delineated exceptions to the warrant requirement. "A search without a warrant requires

the State to prove an exception to the warrant requirement applicable at the time of the search."

> One exception allows police to dispense with the warrant requirement in the presence of exigent circumstances. "The warrant requirement becomes inapplicable where the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Among the well-known exigent circumstances that have justified a warrantless search or seizure are entries (1) to prevent bodily harm or death; (2) to aid a person in need of assistance; (3) to protect private property; and (4) to prevent actual or imminent destruction or removal of incriminating evidence before a search warrant may be obtained. Exigent circumstances have also been found where a suspect is fleeing or likely to take flight in order to avoid arrest; or the case involves hot pursuit or movable vehicles. In addition, we have found exigent circumstances where police entered to aid or prevent further injury to victims of violent crime.

*McDermott v. State*, 877 N.E.2d 467, 473-74 (Ind. Ct. App. 2007) (citations omitted).

[27] In this case, following a 911 call, officers were dispatched to Price's apartment after a report that B.P. had been found unconscious. The officers' arrival was contemporaneous with the EMTs. Because Ingalls and Price could not ride with B.P. in the ambulance, Detective Richhart and another officer transported them to the hospital. Detective Richhart thereafter returned to Price's apartment. At Price's jury trial, Detective Richhart testified that when he returned, he briefly spoke to another officer at the scene and determined that

Price's apartment was not secure since he "didn't know if there was anybody else in the apartment." (Tr. Vol. VII, p. 135). Detective Richhart added

> I just wanted to make sure . . . that there were [] no animals, no other people, no apparent dangers. At this time, we had [] no idea what had happened to [B.P.]. So we didn't know if [B.P.] had gotten into anything. And if he had been, would there have been something apparent that may have helped the doctors make a medical diagnosis. Like I said, we just didn't know if there was anything that [] could disrupt even evidence from the scene.

(Tr. Vol. VII, p. 135). Based on that reasoning, at approximately 10:38 a.m., and in the company of another officer, Detective Richhart entered Price's apartment. During a brief walkthrough that lasted for a about a minute, Detective Richhart observed blood spots on the bedding in B.P.'s room and a blood spot on the bedroom carpet. No apparent dangers, such as chemical substances, were lying around. Moments after exiting Price's apartment, Detective Richhart received a call from the hospital that B.P. had died. At that point, Detective Richhart called another officer and instructed him to obtain a warrant.

[28] In *Middleton v. State*, 714 N.E.2d 1099, 1103 (Ind. 1999), our supreme court noted that "[s]ecuring the house eliminates any risk of destruction of evidence." Here, we find Detective Richhart's cursory walkthrough was permissible in ensuring Price's apartment was secure.

[29] Secondly, we note that "[t]he very point of exigent circumstances is that officers are confronted with a situation where time is of the essence and immediate

action required." *Montgomery*, 904 N.E.2d at 381. As stated by the Supreme Court, "[w]e do not question the right of the police to respond to emergency situations . . . The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal*." Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). We cannot find many situations more urgent than a child who has been found unconscious, was on his way to the hospital, and an officer's need to save that child's life by looking for apparent dangerous substances in the apartment that the child might possibly have consumed, and in turn offering that information to doctors to aid in the child's treatment. Additionally, we note that unlike the majority of cases discussing exigent circumstances, Detective Richhart's entry was not motivated by an intent to apprehend a suspect or to seize incriminating evidence. *See, e.g., McDermott*, 877 N.E.2d at 474. One of the concerns Detective Richhart had prior to entering Price's apartment was to assist the doctors with any information that would aid in B.P.'s treatment. Detective Richhart was unaware that B.P. had died when he performed his cursory sweep, and the record is silent as to whether the walkthrough was geared at gathering incriminating evidence.

[30] Moreover, we find that Detective Richhart's warrantless entry into Price's home constituted a legitimate exercise of the community caretaking function of the police. The community caretaking function is:

> a catchall term for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement

activities. Indeed, besides enforcing criminal laws, police aid those in distress, combat actual hazards, prevent potential hazards . . . and provide an infinite variety of services to preserve and protect community safety.

*Wilford v. State*, 50 N.E.3d 371, 375 (Ind. 2016). When Detective Richhart returned to Price's apartment, he objectively believed that his cursory inspection of Price's apartment would have been helpful to detect any apparent hazardous substances that B.P. might have consumed, and in turn, relay that information to the doctors who were treating B.P. In our view, we find that Detective Richhart was acting out of his concern for B.P. who was in need of medical assistance, and based upon the circumstance, we conclude that Detective Richhart was engaged in a community caretaking function and the entry did not violate Price's Fourth Amendment rights.

[31] In her brief, Price argues that no exigency existed because Detective Richhart did not return to the apartment until 10:40 a.m. and that Detective Richhart "returned from the hospital approximately forty-five minutes after leaving" Price's apartment. (Appellant's Br. p. 16). The record does not support Price's claim. Detective Richhart testified he returned to Price's apartment "before 10:30 a.m.," and that he was gone for "a couple of minutes" after transporting Ingalls to a hospital which was "maybe 300 yards away." (Suppression Tr. p. 8). At the suppression hearing, and at trial, Detective Richhart consistently testified that he performed the walkthrough at 10:38 a.m. before learning of B.P.'s death and he hoped to find any apparent evidence that might assist the

doctors in B.P.'s treatment, and his walkthrough was intended to secure and preserve any evidence located in Price's apartment.

[32] Under the facts and circumstances of this case, the State proved exigency and we conclude that Detective Richhart's warrantless entry into Price's apartment did not violate the Fourth Amendment. Thus, the trial court did not abuse its discretion in admitting any evidence derived from that walkthrough.

## II. *Cellphone*

[33] Next, Price argues that the seizure and search of her cellphone violated her rights under the Fourth Amendment.[3] Specifically, she contends that Detective Richhart improperly seized her cellphone before obtaining a search warrant. Additionally, Price argues that the search warrant was overly broad.

## A. *Seizure*

[34] Absent probable cause, exigent circumstances alone are insufficient to justify a warrantless seizure. *Harless v. State*, 577 N.E.2d 245, 248 (Ind. Ct. App. 1991). ("[E]xigent circumstances justify dispensing with the search warrant, but do not eliminate the need for probable cause."); *Jones v. State*, 409 N.E.2d 1254, 1258 (Ind. Ct. App. 1980) ("A search without probable cause is never justified by the need to prevent the disappearance or destruction of evidence of a crime.").

---

[3] Price likewise makes no separate analysis under the Indiana Constitution regarding the seizure and search of the cellphone. Thus, Price waives her claim since she fails to present a separate independent analysis supporting her state constitutional claim. *See Lockett v. State*, 747 N.E.2d 539, 541 (Ind. 2001).

Whether a particular warrantless seizure violates the guarantees of the Fourth Amendment depends upon the facts and circumstances of each case. *State v. Joe*, 693 N.E.2d 573, 575 (Ind. Ct. App. 1998), *trans. denied*. "The State bears the burden of proving that the warrantless seizure fell within an exception to the warrant requirement." *Id.*

[35] The State asserts that exigent circumstance supported the seizure. Again, we note that "[e]xigent circumstances compelling quick action before a warrant can be obtained are recognized as . . . [an] exception" to the warrant requirement. *Bryant v. State*, 660 N.E.2d 290, 300-01 (Ind. 1995). This exception allows officers to act without a warrant when they "believe evidence may be destroyed or removed before a search warrant is obtained." *Hawkins v. State*, 626 N.E.2d 436, 439 (Ind. 1993).

[36] Turning to the present facts, during the search of Price's apartment, Price and Ingalls relayed to other officers at the scene that there was a "monitor or a camera" in B.P.'s room, and that it "recorded" and sent footage to on an "app" on Price's phone. (Tr. Vol. VII, p.140). Detective Richhart hoped that "whatever footage" that was in Price's cellphone "could answer a lot of questions" regarding B.P.'s cause of death. (Tr. Vol. VII, p.140). After finding Price's phone in Price's bedroom, Detective Richhart asked Price for assistance to retrieve the video footage but started punching the cellphone screen. Because Detective Richhart reasonably believed that Price was deleting evidence from her phone, he correctly seized the phone. Here, the State proved both exigency and an objective reasonable belief from Detective Richhart that Price was

destroying evidence from her phone and the seizure of Price's cellphone did not violate the Fourth Amendment.

[37] Price argues that we should reject the State's exigency argument, and she contends that Detective Richhart improperly created the exigency prior to seizing her phone. In particular, she argues, that Detective Richhart unlawfully removed her "dead" phone from her apartment, brought it to her for assistance, instead of first "obtaining a warrant." (Appellant's Br. p. 20). As a general matter, officers may not circumvent the warrant requirement by purposefully creating exigent circumstances. *State v. Williams*, 615 N.E.2d 487, 488–89 (Ind. Ct. App. 1993). In *Williams*, a police officer already had probable cause to believe there were drugs in a residence before he knocked on the door and it thus was clearly foreseeable that the occupant would attempt to destroy contraband when the officer knocked and identified himself. *Id.* at 488-89. We held the officer's subsequent entry into the residence after observing the occupant run through the house was unconstitutional and noted that there was no explanation as to why a search warrant had not been obtained before approaching the residence. *Id.* Here, by contrast, Price indicated a willingness to help by charging and unlocking her phone, and that she would assist Detective Richhart in obtaining helpful video footage in her phone. However, after the phone was powered, Price began "actively punching stuff on the screen" and refused to return the phone when requested. (Tr. Vol. VIII, p. 142). Detective Richhart had not foreseen that Price would destroy evidence from her phone, and based on Price's alarming acts, Detective Richhart reached

into the car and grabbed the phone from Price's hand.  Under the circumstance, Detective Richhart seizure of Price's phone was justified.

## B. *Overly-Broad Search Warrant*

[38]    As an additional argument, Price argues that the warrant to search her phone was invalid because it was overly broad.  The Fourth Amendment to the United States Constitution forbids general search warrants. "'[A] warrant must describe the place to be searched and the items to be searched for.'" Overstreet v. State, 783 N.E.2d 1140, 1158 (Ind. 2003) (quoting *Phillips v. State*, 514 N.E.2d 1073, 1075 (Ind. 1987)), *cert. denied*, 540 U.S. 1150, 124 S.Ct. 1145, 157 L.Ed.2d 1044 (2004).  Athough the warrant must describe "with some specificity" where officers are to search and what they are to seize, "there is no requirement that there be an exact description."  *Overstreet*, 783 N.E.2d at 1158.  Nonetheless, the warrant must be specific enough so that officers can, "with reasonable effort," ascertain the place to be searched and the items to be seized. *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757 (1925).  This requirement "prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 198, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *see also Griffith v. State*, 59 N.E.3d 947, 958 (Ind. 2016) (observing that a sufficient description avoids giving the police unbridled discretion).  Ultimately, the description in a search warrant should "'be as particular as circumstances permit.'" *State v. Foy*, 862 N.E.2d 1219, 1227 (Ind. Ct. App. 2007) (quoting *United States v. Lievertz*, 247 F.Supp.2d 1052, 1062 (S.D. Ind. 2002)).  Moreover,

to satisfy the particularity requirement, it is permissible if a warrant incorporates by reference certain supporting documents—such as the probable cause affidavit—that collectively "serv[e] to identify the scope of . . . items that could properly be seized." *Membres v. State*, 889 N.E.2d 265, 276 (Ind. 2008).

[39]   After re-seizing Price's cellphone, Detective Richhart instructed another officer, Detective Larry Sanders (Detective Sanders) to obtain a warrant. A probable cause determination hearing was conducted pursuant to that request. Detective Sanders explained to the magistrate that the Mooresville Police Department was investigating the "suspicious death" of B.P. who had been found by Price unconscious that morning. (Appellant's App. Vol. II, p. 141). Detective Sanders continued, "when [the officers] arrived, [Price] had blood on her, [B.P.] had blood on [his] face and mouth areas, and it appeared that [Price had] been giving CPR" to B.P. (Appellant's App. Vol. II, p. 141). Detective Sanders mentioned that they had already obtained a warrant to search Price's apartment, but the department was seeking an additional warrant to "do a forensic search" of Price's phone. (Appellant's App. Vol. II, p. 142). When asked what specific things the department hoped to find on Price's cellphone, Detective Sanders stated, "[W]e have a phone, we're trying to cross all of our T's and dot all of our I's []. Basically, Your Honor, we're trying to verify her story, [*i.e.*] that at such time she called law enforcement or medical personnel to arrive, to where we received the phone call about 10:30 [a.m.]." (Appellant's App. Vol. II, p. 144). Detective Sanders testified that the search was limited to "pertinent information" relating to B.P.'s suspicious death, and he testified that

if the data on the cellphone is "erased" or reset to factory settings, the department would "lose" any possible leads. (Appellant's App. Vol. II, p. 145). At the close of the probable cause determination hearing, the magistrate granted the warrant stating, it is "limited" in its "scope." (Appellant's App. Vol. II, p. 146).

[40] The ensuing search warrant that permitted the search of Price's cellphone provided:

> The right to physically and forensically examine **White Samsung Galaxy Express 3 phone in a black case belonging to Megan Price** with [] serial number P86730V59F3, and the electronic data and intellectual content contained on said-device[], including but not limited to, phone settings and information, pictures, videos, audio files, ringtones, voicemails, contact lists, calendars, text messages, multi-media messages, other electronic communications, records of calls received, sent, or missed, details of internet activity, installed applications, memos, route data, location data, settings, databases, favorites, historical data, documents, and any user-related data, as well as any associated accessories, including, but not limited to, chargers, cables, media cards and SIM cards. These items will be seized and later examined. There may also be the need for decrypting and/or breaking of passwords.
>
> (***All of which is evidence of the crimes of neglect, homicide***)

(Appellant's App. Vol. II, p. 136) (emphasis in the original).

[41]    Price argues that "[e]ven if there was probable cause to search [her] phone for texts and calls a few hours prior to the call to 911, that probable cause did not extend to searching everything on the phone."  (Appellant's Br. p. 26).

[42]    Recently, we addressed the type of evidence which would support a search of a suspect's cellphone in *Carter v. State*, 105 N.E.3d 1121, 1127 (Ind. Ct. App. 2018), *trans. denied*.  One of Carter's claims was that the search warrant authorized a broad search of his device and was therefore an impermissible general warrant.  *Id*.  The warrant in Carter's case authorized the searching of his phone for:

> fruits, instrumentalities and evidence pertaining to the crime(s) of DEALING, POSSESSION and/or CONSPIRACY TO COMMIT DEALING OR POSSESSION OF METHAMPHETAMINE, as more particularly described as follows: [ ] Permission to search the above described phone for any information relating to calls, messages, including Facebook messages and accounts, **and all information** including but not limited to photographs, images, emails, letters, applications, and folders as well as any messages that may be stored on the phone **that would indicate the identity of the phone's owner/user** and permission to view and copy said information if deemed necessary for preservation.

*Id*. at 1129 (emphasis in the original).  Notwithstanding Carter's claims that the warrant was a general warrant, we determined that the

> the warrant specifically described the place law enforcement could search—the phone recovered from Carter—and specifically described what law enforcement could search for—(1) "any information relating to calls, messages, including Facebook

messages and accounts," and (2) "all information . . . that would indicate the identity of the phone's owner/user." []  Moreover, the first clause permitting the search for calls and messages enjoys a close nexus to the probable cause that justified issuing the search warrant—which is that Carter was a suspected drug dealer, and drug dealers use cell phones to communicate with others involved in illicit drug activity.  []  Thus, this aspect of the search warrant was "tailored to its justifications."

*Id*. at 1130.  (internal citations omitted).

[43]  Similar to *Carter*, the warrant in Price's case described the place law enforcement could search—*i.e.*, Price's white Samsung Galaxy, and the warrant authorized Mooresville Police Department to search for "electronic data and intellectual content contained on said-device[], including but not limited to, . . . *text messages*, . . . *records of calls received, sent, or missed*."  (Appellant's App. Vol. II, p. 136) (emphasis added).  The clause of the warrant that related to searching of Price's texts enjoyed a close nexus to the testimony offered by Detective Sanders at the probable cause determination hearing—that his department was investigating the suspicious death of B.P., and they hoped a search of Price's phone would yield "pertinent information."  (Appellant's App. Vol. II, p. 145).

[44]  Price argues that the "warrant itself contains no limitation on dates or material to search for or a requirement that the search be related to confirming her story about finding [B.P.] shortly before calling 911[]; instead, it grants the broad right to physically examine the electronic data and intellectual content contained on [her] phone."  (Appellant's Br. p. 27).  We disagree.  Like looking through drawers in a home or office file cabinet for specific files or letters that

are relevant to the investigation, a great deal of other information had to have been sifted through Price's phone to find the relevant information. *See Carter*, 105 N.E.3d at 1130 (citing *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006) (holding that "'[A] computer search may be as extensive as reasonably required to locate the items described in the warrant' based on probable cause.") *see also, Wheeler v. State,* 135 A.3d 282, 301 (Del. 2016) ("Some irrelevant files may have to be at least cursorily perused to determine whether they are within the authorized search ambit."). Although Detective Sanders' testimony established that the scope of the search would be to verify Price's version of events the morning B.P. died, Detective Sanders also testified that his department was investigating the suspicious death of B.P., and they were looking for any pertinent information relating to B.P.'s death. Indeed, two weeks prior, Ingalls and Price discussed killing B.P. through text messages, and these text messages were relevant pursuant to the specific portion of the warrant that authorized searching Price's phone for messages relating to the death of B.P.

[45] Based on the foregoing, we conclude that the evidence seized from Price's phone was not pursuant to an impermissibly general warrant. Therefore, the trial court did not abuse its discretion by admitting the evidence over Price's objection.

## CONCLUSION

[46] Here, we hold that exigent circumstances existed to allow Detective Richhart's warrantless entry into Price's apartment and the trial court did not abuse its

discretion by admitting evidence procured by that entry. Also, the trial court did not abuse its discretion by admitting evidence obtained from Price's cellphone, and the search was pursuant to a valid search warrant.

[47] Affirmed.

[48] Kirsch, J. and Robb, J. concur