# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 17 2019, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Steven E. Ingalls, Jr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 17, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1751<br><br>Appeal from the Morgan Circuit Court<br><br>The Honorable Matthew G. Hanson, Judge<br><br>Trial Court Cause No.<br>55C01-1706-F1-1252 |

**Altice, Judge.**

## Case Summary

[1] Following the homicide of his girlfriend's five-year-old son, B.P., a jury found Steven E. Ingalls, Jr. guilty of Level 1 felony conspiracy to commit murder, Level 1 felony neglect of a dependent resulting in death, and Level 3 felony neglect of a dependent. He argues on appeal that, with regard to the conspiracy to commit murder conviction, the State failed to present sufficient evidence that he and his girlfriend, Meghan Price, had an agreement to kill B.P. He also claims that the trial court abused its discretion when it denied his request for a mistrial after the State failed to properly redact one of his recorded statements to police.

[2] We affirm and remand.

## Facts & Procedural History

[3] B.P. was born in June 2011 and suffered from a number of medical issues including a genetic condition called Fragile X chromosome syndrome, autism, impulse control disorder, anxiety, and obsessive-compulsive disorder. He experienced developmental delays, had limited vocabulary for a child his age, and sometimes exhibited self-harming behavior. B.P. also suffered from pulmonary aspirations, reflux, pediatric pulmonology, and gastrointestinal issues. B.P. was prescribed several psychotropic medications, which Price administered to him, including Sertraline, Clonidine, and Risperidone.

[4] Ingalls and Price had been in a relationship since at least 2013, and Ingalls often stayed at Price's apartment with her and B.P. Ingalls and Price have one child

together, S.I., who was born in 2014. The record reflects that Ingalls had great disdain for B.P., viewing him as a burden and an annoyance. He also felt that B.P. interfered with his relationship with Price. On different occasions during B.P.'s life, he had injuries to his body including bumps, bruises, abrasions, a broken arm, and a broken leg. On several occasions, the principal where B.P. attended preschool reported the injuries to the Indiana Department of Child Services, who investigated but did not substantiate abuse. In November 2015, B.P was admitted to the hospital with headaches, congestion, extreme drowsiness, and a slow heart rate. About a year later, in November 2016, B.P. underwent a surgical procedure for an upper lip laceration, and that same month he went to the emergency room with breathing issues and was diagnosed with croup and possibly asthma.

[5] Sometime after B.P. went to bed on November 22, 2016, he suffered trauma at the hands of one or more other individuals and died in his bedroom. On the morning of November 23, B.P. had blood and other bodily fluid around his mouth, and his upper lip, for which he had undergone surgery, was split open. At 10:13 a.m., Ingalls called 911 from Price's apartment reporting an unconscious and unresponsive child that was not breathing. Emergency personnel arrived in less than two minutes. They found B.P. and Price on the stairs in the entryway to the apartment building. B.P. had no pulse and was not breathing. His skin was mottled, and his body was cold and already in a state of rigor mortis, indicating he had been deceased for some time.

[6] Ingalls was present at the scene when the first responders arrived. He was standing outside of the apartment building holding two-year-old S.I. As described by one emergency responder, Ingalls was "just kind of walking around, or standing there" and appeared as though "he might have been one of the neighborhood people." *Transcript Vol. IV* at 228. Ingalls "didn't really seem upset . . . he was just kind of there." *Id.*

[7] B.P. was transported by ambulance to the hospital as paramedics attempted to resuscitate him. Mooresville Police Department (MPD) Captain Brad Yarnell was going to transport Price to the hospital, but Price asked to return to her apartment first to get some shoes. MPD Detective Chad Richhart and Price's neighbor, Tiffany Hall, accompanied Price back to the apartment. Detective Richhart stood in the doorway to her apartment and saw Price "running around the apartment" and heard "a lot of movement" in the back of the apartment. *Transcript Vol. VII* at 151-52. Hall went with Price to B.P.'s bedroom, where she saw Price climb up onto the top bunk of B.P.'s bed and "mov[e] things around." *Transcript Vol. VIII* at 76. Hall saw a green pillow on top of the bunk bed and a wall-mounted camera above the bed. With regard to the camera, Hall saw Price "jostle it around, like she was getting something." *Id.*

[8] Once Price got her shoes, Captain Yarnell transported Price to the hospital and accompanied her inside. Detective Richhart transported Ingalls and S.I. to the hospital, but just dropped them off and returned to the apartment, where Detective Richhart conducted a "quick walkthrough" because, he explained, police did not know at that point "if there's any other children in the home, any

other people in the home" or "if this is a result of an injury, an illness" and had "no idea" what the situation was in the apartment. *Transcript Vol. VII* at 153-54. Inside B.P.'s bedroom, Detective Richhart observed an area on the floor saturated with blood, some blood along the top bedrail and on bedding, and blood on a floor rug. Captain Yarnell, still at the hospital, contacted Detective Richhart to confirm that B.P. was in fact deceased, and the two decided to open an investigation into B.P.'s death.

[9] At Ingalls's request, Detective Yarnell drove Ingalls from the hospital back to the apartment, where police were executing a search warrant on the residence. When Ingalls arrived back at the apartment, Detective Richhart asked Ingalls if he would agree to accompany him to the police station for an interview. Ingalls consented, and, in the interview, Ingalls described being in the apartment the night before, saying that B.P. went to bed as normal, but was found dead in the morning by Price. He indicated that he had no knowledge as to how B.P. died.

[10] Meanwhile, during their search of the apartment, police found medications prescribed to B.P. In B.P.'s bedroom, they found red liquid stains that appeared to be blood spatter on the railing of the bunk bed and on some of the stuffed animals inside of a bin next to the bed. The presence and patterns of the blood spatter indicated to officers that the bleeding had been caused by some kind of trauma. Police saw what appeared to be blood stains on a blue rug and on the carpet. Police also found a green pillow, shaped as a character from the children's television show Yo Gabba Gabba, on the ground in B.P.'s closet, propped up against a toy bin. The pillow had a red stain, which appeared to be

blood, as well as a white stain. Police saw the wall-mounted video camera in B.P.'s bedroom and, at some point that day, Detective Richhart learned that the camera may have recorded video or sent information to an app on Price's phone.

[11] Price arrived back at the apartment about the same time as police were finishing their search. Detective Richhart approached Price in the parking lot and told her that police had found the video camera by B.P.'s bed and understood that it may have recorded information to an app on Price's phone. He asked if he could have her permission to search her phone in order to view the footage from B.P.'s room. Price told him that she did not have her phone nor did she know where it was. Detective Richhart and another officer found it in her bedroom between the bed and the wall, although the phone's battery was dead.

[12] Detective Richhart took the phone to Price, who identified it as hers. The phone was charged in a car in which Price was sitting, and once it powered up, text messages and notifications began arriving. Richhart asked Price to give the phone to him, but Price told Richhart that she needed to check her text messages. Detective Richhart had "a great deal of difficulty getting the phone from [Price]" and she "was frantically doing stuff on her phone" for approximately twenty seconds, as he asked for her phone. *Transcript Vol. VIII* at 88. Believing that Price may have been destroying evidence, Detective Richhart leaned in through the open passenger window and took Price's phone from her.

[13]    Shortly thereafter, police obtained a search warrant for Price's phone. Data showed that on November 16, 2016, Price had conducted several internet searches for "risperidone overdose." *State's Exhibit 155*. Data analysis also revealed that at 2:10 p.m. on November 23, which was about the same time that Detective Richhart watched Price pressing the screen of her phone before handing it over to police, she had opened the app on her phone that was used to access surveillance video for the camera over B.P.'s bed.

[14]    An initial autopsy was conducted on November 23. The forensic pathologist observed that B.P. was "very thin and frail" and there were areas of blunt force trauma, including contusions to his face, mouth, and oral cavity. *Transcript Vol. V* at 148. B.P. had two black eyes, a hemorrhage near his nose, and injury to his lips. The presence of injuries to B.P.'s nostrils, the septum of his nose, and injuries to his upper and lower lip areas indicated that B.P. had been smothered by another individual and had died of asphyxiation. The forensic pathologist also found a secondary cause of death: "acute Sertraline, Clonidine, and Risperidone intoxication." *Id*. at 173. Testing showed that the drugs Sertraline and Clonidine were present in B.P.'s blood at levels higher than the normal therapeutic level. The drug Risperidone was also found in B.P.'s blood, though at levels lower than the therapeutic level, but which could have been near the therapeutic range prior to his death.

[15]    Detective Richhart conducted a second interview with Ingalls on November 23. Ingalls confirmed that Price had given B.P. his medications on the night he died. Detective Richhart informed Ingalls that the preliminary results of B.P.'s

autopsy indicated that B.P. had died as a result of being suffocated. Ingalls denied harming B.P. After the interview, Detective Richhart obtained a warrant to search Ingalls's phone, which revealed the following texts to Price in the days and weeks before B.P.'s death. In the early morning hours of October 1, 2016, Ingalls sent a text to Price that stated, in part:

> [B.P.] needs a foot broken off in his ass to make up for his lack of basic intelligence. . . . No, he's just a spoiled little retard running around disobeying the f*uck out of you and everybody else whos [sic] dumb enough to play into his games. . . . Put your foot up his ass and make him grow up a few years and stop sh*tting and bleeding on himself and then ill [sic] think about the slight possibility of not putting him down and beating him to the edge of his life.

*State's Exhibit 136.* Later in that evening, Ingalls sent Price a text message that stated, in part:

> Im [sic] sorry for getting so upset and going after [B.P.] I dont know how to handle him, maybe its [sic] for the better I stay away from him but that's what makes me hate him. He's always coming between me and you. Even when Im [sic] not around hes [sic] always causing stress and I have really low patience with it bc I just want it to end and it only gets worse as he gets older. Idk.

*State's Exhibit 156.* On October 15, 2016, Ingalls texted Price that "instead of an asswhooping[,]" B.P. gets "babied" and uses "his condition to take advantage" of Price but she is "too blind" to see it. *Id.*

[16] On November 12, 2016, Ingalls sent the following text message to Price:

I hate your son, he is nothing but a troublemaking worthless excuse for a retarded [sic] down to his DNA core malnutritioned ugly shouldve [sic] been cum stain that needs to rot in a mental institution playing with his own feces and pissing on himself while the nursing staff beats him until he's deaf dumb and motionless. I want to buy a ticket to the moment he takes his last breath, so I can be the last thing he sees as i [sic] rip his jawbone off of his face and personally cut his brainstem in half just to make sure not one more stupid f*cking thought processes in his two-celled f*cking brain. He'll never have a dad [because] no one in their right f*cking mind will ever stay around more than 5minutes [sic] around that f*cked up kid that cant [sic] go 2 days without bashing his own face into hamburger against whatever he can so mommy will love on him. Lol, kill him while he's young and do something with your life before he robs you of any chance of ever being happy or being anything other than a stay at home retard caretaker.

*Id.* A few minutes later, Ingalls texted the following to Price:

He's not ruining my life, Ill [sic] run for the f*cking hills before i [sic] stay stressed my entire life or kill him in such a violent way that the news cant [sic] even describe the scene without throwing up. Im [sic] not going to prison over that little scrawny hand-flapper.

*State's Exhibit 136.* A couple hours later, he texted Price:

This is exactly why I hate him and want him gone. If it wasnt [sic] for him there would just be [S.I.], life would be happy and you wouldnt [sic] be stuck at home your whole life going nuts and to the doctor twice a day. And I wouldn't have to hear him screaming all day and night and looking at a kid whos [sic] bashing his face in onna [sic] daily basis for attention with blood and meat hanging from his f*cking face.

*Id.*

[17] The search of Ingalls's phone also showed that he had conducted the following internet searches between October 17 and November 16, 2016: "kill my mentally retarded step son" (October 17); "what's the highest fall a human can survive" (October 18); "beat child fragile x abuse" (October 18); "most painful ways to die" (October 19); "most painful torture" (October 19); "I want to kill my autistic child" (October 21); "untraceable poison" (October 22); "can get brain damage from suffocation" (October 27); "injuries that cause long term excruciating pain" (November 1); "why do I violently beat my autistic child" (November 3); "homicide by disease" (November 9); "why do I hate my disabled child" (November 12); "can I rip the jaw off a human?" (November 12); "autistic son shot" (November 12); "risperidone overdose difficulty breathing" (November 16). *State's Exhibit 141*; *Transcript Vol. VI* at 102.

[18] Ingalls was interviewed by police again on December 2. Ingalls brought with him a typed timeline of events measured "down to the minute," which Detective Richhart said he did not ordinarily see during interviews. *Transcript Vol. VIII* at 175. Ingalls stated in the interview that Price knew about the above-mentioned internet searches. Ingalls was interviewed again on December 4, after Ingalls contacted Detective Richhart and asked to meet with him. Ingalls told Detective Richhart that, at some point after B.P. died, he learned from Price that she had moved the Yo Gabba Gabba green pillow from B.P.'s top bunk to the closet, which she did when she went into the apartment to get her shoes before going to the hospital. He also said that Price told him she was

"scared" about what toxicology testing would reveal because she may have "overdosed [B.P.] with Clonidine." *State's Exhibit 188B* at 11.

[19] The investigation into B.P.'s death continued through early 2017, and included a series of interviews with neighbors, family, school personnel, and medical providers. Detective Richhart received a final autopsy report on February 1, 2017, which confirmed that B.P.'s manner of death was a homicide and that his cause of death was asphyxiation. The placement of the stains on the Yo Gabba Gabba pillow, when compared to the trauma around B.P.'s nose and mouth, suggested to police that he was smothered with that pillow.

[20] In late June 2017, police arrested Ingalls for the murder of B.P. The arrest occurred at Price's apartment, and Price was present at the time. As Ingalls was being taken into custody, Detective Richhart saw Ingalls make eye contact with Price and say to her, "[S]tick to the plan." *Transcript Vol. VIII* at 185.

[21] On June 23, 2017, the State charged Ingalls with Level 1 felony conspiracy to commit murder (Count I); Level 1 felony neglect of a dependent resulting in death (Count II); and Level 3 felony neglect of a defendant resulting in serious bodily injury (Count III).[1] Ingalls filed a motion in limine pursuant to Ind. Rule

---

[1] Price was charged with Level 1 felony conspiracy to commit murder, Level 1 felony neglect of a dependent resulting in death, and Level 3 felony neglect of dependent resulting in serious bodily injury. Prior to trial, the State dismissed the conspiracy charge. A jury found Price guilty of the remaining charges. The trial court merged the Level 3 felony neglect conviction into the Level 1 felony neglect conviction and sentenced Price to a term of thirty-six years in the DOC. This court affirmed her conviction. *Price v. State*, 119 N.E.3d 212 (Ind. Ct. App. 2019).

Evid. 404(b), asking for exclusion of evidence of Ingalls's "involvement with and/or use of drugs including but not limited to the fact that he was undergoing Methadone treatment at the time of the offense[.]" *Appellant's Appendix Vol. 2* at 118. On April 19, 2018, the trial court entered an order instructing the State to redact certain references to prior bad acts committed by Ingalls under Evid. R. 404(b), including references to the word "methadone" contained in his statement to Detective Richhart. *Id.* at 239.

[22] The two-week jury trial began on May 14, 2018. The State presented evidence as discussed above. During Detective Richhart's testimony, the State played the video recording of Ingalls's first interview with Detective Richhart, which occurred about 11:30 a.m. on November 23. In it, Ingalls described that he got up at 6:30 a.m. or so, left the home in the morning to visit a health clinic, where he goes every day at 7:30 a.m., returned about 8:30 a.m. and got breakfast for S.I., and that later, closer to 10:00 a.m., Price woke up and, when she went to wake B.P., found him dead in bed. Ingalls said that he came into the room and did see some blood on B.P.'s face, but that that was not unusual because B.P. sometimes hit his head or face. Ingalls said he picked up B.P., who was cold and stiff, and brought him to the floor, where he said he and Price attempted CPR. He then called 911, and Price carried B.P. to the entryway of apartment building. Referring to B.P., Ingalls stated, "I love the kid. I always have. I always accepted him." *State's Exhibit 152A* at 66. After the interview concluded, Detective Richhart drove Ingalls back to the apartment. He recalled at trial that, while in the car, Ingalls stated, "I always wondered what life would

be like if something like this happened[,]" which statement struck Detective Richhart as "very odd." *Transcript Vol. VIII* at 85.

[23] Regarding the "health clinic" that Ingalls had gone to that morning, the discussion with Detective Ingalls included the following:

> INGALLS:  I go to the health clinic every morning.
>
> DETECTIVE:  Uh-huh.
>
> INGALLS:  Um, I got to be there at 7:30 to 8:15. So I went there and came back, um, I got there about 8:35. [REDACTED].
>
> DETECTIVE:  Gotcha. You get to go every day?
>
> INGALLS:  Yeah, pretty much every day, um, unless I don't want to that day, but usually I, that's where I get my medication.
>
> DETECTIVE:  Gotcha. Is it methadone?
>
> INGALLS:  Methadone, yeah.  So I've been on that for about two years.

*State's Exhibit 152* at 00:27:13-00:27:39.  Thereafter, out of the jury's presence, Ingalls moved for a mistrial because the references to "methadone" were admitted over the trial court's prior order in limine.  The trial court expressed its frustration with the State for its failure to follow the order, but after taking the matter under advisement, the court denied Ingalls's motion, stating:

I had to go back and do research, and obviously, my interns helped me out on this. And it's close. And it's something out there now that there .. the .. the State has thrown out there, which could easily be appealable. . . . It is pretty large. With that being said, there are remedies, over objection obviously. The mistrial (inaudible), the Court is going to deny that at this point in time. However, I want you to give [an] in limine instruction initially that basically reads, ladies and gentlemen, before our lunch break the word was discussed in the video [that] should not have been included. This Court has ordered a redact [sic] to that. Any discussion or use of the word methadone, the State negligently and irresponsibly failed to redact the video outside of this Court's order. This discussion of methadone is not admissible evidence. You will not make any reference to this word or have any discussion about this word from this point forward. Mr. Lidy [counsel for Ingalls], I'm going to give you the absolute right to tell me you want more, you want less. I have to give [an] in limine instruction. That's the only possible way to "remedy" this the best I can at this point over your objection.

*Transcript Vol. VII* at 178-79. While Ingalls's counsel disagreed that an instruction could cure the problem, he declined the court's offer to provide any further limiting instructions. The trial court confirmed, "so I'm going to read the instruction[,]" but again offered, "I know you don't agree with it, but it is what it is. And if you want me to say something different, you let me know." *Id*. at 182.

[24] The court then gave the following admonishment to the jury with regard to Exhibit 152:

I need to read an instruction that has been put together by the Court. So please listen closely. Ladies and gentlemen, before our lunch break, a word was discussed in the video that should not have been included. This Court had ordered to redact any discussion or use of the word methadone. The State negligently and irresponsibly failed to redact the video to coincide with this Court's orders. This discussion of methadone is not admissible evidence. You will not make any reference to this word or have any discussion about this word from this point forward.

*Id.* at 184-85.

[25] Following the State's presentation of evidence, Ingalls moved for a directed verdict on all three counts, which the trial court denied. Ingalls presented his witnesses and evidence, and the jury thereafter found Ingalls guilty as charged. The trial court sentenced Ingalls to thirty-nine years in the Indiana Department of Correction on Count I, conspiracy to commit murder.[2] Ingalls now appeals.

---

[2] The State notes, and we acknowledge, some discrepancy between the trial court's sentencing order and the abstract of judgment. The trial court's written sentencing order, as well as its oral statements at the sentencing hearing, reflect that the trial court intended to merge the two neglect convictions (Counts II and III) into the conspiracy conviction (Count I), and the court sentenced Ingalls to thirty-nine years on Count I. *Transcript Vol. X* at 18; *Appellant's Appendix Vol. III* at 221. The abstract of judgment, however, reflects convictions on Counts I, II, and III and concurrent sentences of thirty-nine years for each. *Appellant's Appendix Vol. III* at 222. We remand to the trial court with instructions to correct the abstract of judgment and vacate Counts II and III.

# Discussion & Decision

## I. Sufficiency of the Evidence

Ingalls claims that the evidence was insufficient to support his conviction for conspiracy to commit murder.[3] Our standard of review for sufficiency claims is well settled. *Dickenson v. State*, 835 N.E.2d 542, 551 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the evidence or assess the credibility of witnesses. *Id*. We look to the evidence and the reasonable inferences to be drawn therefrom that support the verdict. *Id*. We will affirm the convictions if there is sufficient probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id*. at 552.

To convict Ingalls of conspiracy to commit murder, the State had to prove that (1) with intent to commit murder, (2) Ingalls and Price entered into an agreement to commit murder, and (3) either Ingalls or Price performed an overt act in furtherance of the agreement. Ind. Code § 35-41-5-2. Ingalls challenges only the second element, contending that "[t]he State failed to prove that [he] and Price had an agreement to kill B.P." *Appellant's Brief* at 14. We disagree.

The State is not required to establish the existence of a formal express agreement to prove a conspiracy. *Dickenson*, 835 N.E.2d at 552. It is sufficient

---

[3] Ingalls also challenges the sufficiency of the evidence for the neglect of a dependent convictions. Because we find that the trial court merged the neglect of a dependent convictions into the conspiracy to commit murder convictions, after finding that they were "all the same event," we do not reach Ingalls's arguments concerning the neglect convictions. *Transcript Vol. X* at 17.

if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense. *Weida v. State*, 778 N.E.2d 843, 847 (Ind. Ct. App. 2002). "'The agreement as well as the requisite guilty knowledge and intent may be inferred from circumstantial evidence alone, including overt acts of the parties in pursuance of the criminal act.'" *Erkins v. State,* 13 N.E.3d 400, 407 (Ind. 2014) (quoting *Survance v. State*, 465 N.E.2d 1076, 1080 (Ind. 1984)).

[29] Here, the State presented evidence that Ingalls had great disdain for B.P. and resented the attention that B.P. required due to his health issues and special needs. In the weeks prior to B.P.'s death, Ingalls texted Price that he "hate[d]" B.P. and wanted him "gone" so that B.P. would no longer come between them. *State's Exhibit 136.* Ingalls suggested the following to Price: "[K]ill [B.P.] while he's young and do something with your life before he robs you of any chance of ever being happy or being anything other than a stay at home retard caretaker." *State's Exhibit 156.* Ingalls advised Price that "[B.P.]'s not ruining my life" and, instead, Ingalls would either "run for the f*cking hills" or "kill [B.P.] in such a violent way that the news cant [sic] even describe the scene without throwing up." *State's Exhibit 136.* Ten days before B.P.'s death, Ingalls texted Price that he wanted to "buy a ticket" to the moment when B.P. "takes his last breath" so that Ingalls would be the last thing that B.P. would see "as [Ingalls] rip[s] [B.P.s'] jawbone off of his face and personally cut his brainstem in half just to make sure not one more stupid f*cking thought processes in his two-celled f*cking brain." *State's Exhibit 156.* Despite receiving these messages from

Ingalls, directly stating that he wanted to violently kill B.P., Price neither ended her relationship with Ingalls, nor contacted police.

[30] The State also presented evidence that, on November 16, which was just days before B.P. died, Price and Ingalls each conducted a "risperidone overdose" search on their respective cell phone. *State's Exhibits 141*, *155.* In addition, Ingalls conducted a number of searches on his phone, including the following between October 17 and November 16, 2016: "kill my mentally retarded step son"; "beat child fragile x abuse"; "I want to kill my autistic child"; "can get brain damage from suffocation"; "can I rip the jaw off a human?" *State's Exhibit 141*; *Transcript Vol. VI* at 102. Ingalls told police that Price knew about those searches.

[31] When emergency personnel were taking B.P. away in an ambulance and attempting to resuscitate him, Price went back into the apartment to get her shoes. However, Price did not just run into the apartment for her shoes; she was observed by her neighbor, Hall, climbing on the top bunk, where B.P. slept, rummaging around in the bedding, and handling the camera that was positioned over B.P.'s bed. The camera recorded or was capable of recording footage to an app on Price's phone. Later that day when police asked Price for her phone, she was reluctant to turn it over, and instead she checked messages and accessed the app with the possible video footage of B.P.'s bed. According to Ingalls, Price moved the green Yo Gabba Gabba pillow, which police believed was used to smother B.P., from B.P.'s bed to the closet. Toxicology testing revealed that a secondary cause of death was intoxication from

Sertraline, Clonidine, and Risperidone, and Price was the person who had administered the medications to B.P. before he went to bed on November 22.

[32] The State argues, and we agree, "The jury was not required to accept the timing of these events as mere coincidence." *Appellee's Brief* at 29. Rather, the jury "could infer from Ingalls'[s] and Price's concerted actions that the two had entered into an agreement to kill Price's young son." *Id.* Notably, as Ingalls was being arrested months later, Ingalls told Price to "stick to the plan." *Transcript Vol. VIII* at 185. From the evidence presented at trial, the jury could have inferred that Ingalls and Price entered into an agreement to murder B.P.

## II. Request for Mistrial

[33] Ingalls claims that the trial court should have granted his request for a mistrial, which he made after the State failed to redact the word methadone from Ingalls's first interview with Detective Richhart, as it had been ordered to do prior to trial. "A mistrial is an 'extreme remedy in a criminal case which should be granted only when nothing else can rectify a situation.'" *Suding v. State*, 945 N.E.2d 731, 737 (Ind. Ct. App. 2011) (quoting *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001)), *trans. denied*. To prevail in seeking a mistrial, the defendant must show he was placed in a position of grave peril to which he should not have been subjected. *Id.* The gravity of the peril is determined by the likely persuasive effect the error had on the jury's decision. *Id.* "A timely and accurate admonition is presumed to cure any error in the admission of evidence, . . . so reversible error will seldom be found if the trial court has

admonished the jury to disregard a statement made during the proceedings."
*Id.* (citing *Owens v. State*, 937 N.E.2d 880, 895 (Ind. Ct. App. 2010) and *Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001)).

[34] This Court reviews the denial of a motion for mistrial for an abuse of discretion. *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). "A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury." *Id.*; *see also Suding*, 945 N.E.2d at 737 (trial court's decision "is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury").

[35] Here, Ingalls had filed a motion in limine to exclude evidence of Ingalls's use of drugs "including but not limited to the fact that he was undergoing Methadone treatment at the time of the offense[.]" *Appellant's Appendix Vol. 2* at 118. The trial court granted the request and ordered the State to redact any reference to the word methadone. However, when the State played the videotape of Detective Richhart's first interview with Ingalls to the jury, Exhibit 152, the word had not been redacted. Specifically, after Ingalls stated that he had been to a health clinic on the morning B.P. was found deceased, the following exchange occurred:

> DETECTIVE: Gotcha. You get to go every day?
>
> INGALLS: Yeah, pretty much every day, um, unless I don't want to that day, but usually I, that's where I get my medication.

DETECTIVE:  Gotcha. Is it methadone?

INGALLS:  Methadone, yeah.  So I've been on that for about two years.

*State's Exhibit 152.*[4]

[36]   After the video concluded, and out of the jury's presence, Ingalls requested a mistrial.  The trial court expressed its frustration and displeasure with the State's inadvertent inclusion of the word in the video recording, but following argument, discussion, and a recess, it denied Ingalls's motion.  The court then gave the following admonition to the jury:

> I need to read an instruction that has been put together by the Court.  So please listen closely.  Ladies and gentlemen, before our lunch break, a word was discussed in the video that should not have been included.  This Court had ordered to redact any discussion or use of the word methadone.  The State negligently and irresponsibly failed to redact the video to coincide with this Court's orders.  *This discussion of methadone is not admissible evidence.  You will not make any reference to this word or have any discussion about this word from this point forward.*

---

[4] We note that State's Exhibit 152A was a transcript of the video, a copy of which the jurors received as the video was being played.  The transcript was properly redacted and did not include the word methadone. *State's Exhibit 152A* at 42.

*Transcript Vol. VII* at 184-85 (emphasis added). Prior to giving the admonition, the trial court gave Ingalls the opportunity to review it and, further, repeatedly asked if Ingalls wanted to add or change anything. Ingalls declined.

[37] Ingalls acknowledges that a timely and accurate admonition is presumed to cure any error in the admission of evidence, but argues that the court's admonition did not do so here for a couple of reasons. Initially, he argues that "[e]ven though the jury heard only a single mention of the methadone clinic, Ingalls talked about going to the clinic in several of his statements to police" and "[t]he jury would have known precisely what clinic he was referring to and why he was going there for treatment[,]" and this "placed Ingalls in grave peril." *Appellant's Brief* at 19-20. We disagree that the mention of methadone in the recorded interview placed Ingalls in grave peril.

[38] As stated, the gravity of the peril is assessed by considering the likely persuasive effect the error had on the jury's decision. *West*, 758 N.E.2d at 56. Here, there was considerable evidence implicating Ingalls in B.P.'s death and demonstrating that he and Price conspired to get rid of her son. The jury viewed Ingalls's four interviews with police, they saw his disturbing texts from Ingalls to Price about violently killing B.P., they saw the many internet searches in the weeks prior to B.P.'s death, which included death by suffocation and risperidone overdose. By the time that Exhibit 152 was played, the jury had already heard from over twenty-five witnesses, including the medical examiner who testified that B.P., while in his bed, had been smothered by another person and that a secondary cause of death was intoxication from his prescription

medications. The jury thereafter heard testimony from an additional fifteen State's witnesses and over a dozen defense witnesses. The reference to methadone in Exhibit 152 was minimal in the context of the entire trial, and the evidence of guilt was substantial. The reference to methadone did not render Ingalls's trial fundamentally unfair.

[39] Ingalls also argues that the court's admonition to the jury did not cure the error because it "only stated that the jury could not 'make any reference to [methadone] or have any discussion about this word from this point forward'" but did not instruct the jury "that it could not consider evidence of Ingalls'[s] treatment for a drug addiction." *Appellant's Brief* at 19 (quoting court's admonition read to jury at *Transcript Vol. VII* at 185). To the extent that this argument is asserting that the language of the admonition should have been different, we reject his claim. As an initial matter, we find that effectively there is little distinction between what the admonishment said and what Ingalls now wants because, if the jurors were precluded from having "any discussion about" Ingalls's use of methadone during deliberations, then the jury as a group necessarily could not "consider" it. *Appellant's Brief* at 19. However, even if the admonishment was deficient, Ingalls invited the error. That is, if Ingalls was not satisfied with the admonishment as written, and wanted it to say that the jury "may not consider" the reference to methadone, he had multiple opportunities to request that change, but declined. A party may not take advantage of an error that he invites. *Brewington v. State*, 7 N.E.3d 946, 975 (Ind. 2014).

[40]     We conclude that here, where the trial court promptly admonished the jury that the State had erroneously failed to redact the word methadone from the video, that anything about methadone was not admissible evidence and that the jury was not to discuss methadone going forward, the trial court cured the improper evidence with its admonition. Accordingly, the trial court did not abuse its discretion by denying Ingalls's motion for mistrial.

[41]     We affirm Ingalls's conviction for conspiracy to commit murder and remand with instructions to correct the abstract of judgment.

[42]     Judgment affirmed and remanded.

Kirsch, J. and Vaidik, C.J., concur.