

IN THE

# Court of Appeals of Indiana

Cameron Banks,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Mar 15 2024, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 15, 2024

Court of Appeals Case No.
23A-CR-898

Appeal from the Marion Superior Court

The Honorable Marc Rothenberg, Judge

Trial Court Cause No.
49D29-2002-MR-6883

---

**Opinion by Judge Vaidik**
Chief Judge Altice and Judge Weissmann concur.

**Vaidik, Judge.**

# Case Summary

Three defendants were tried together and convicted of four counts of murder and four counts of robbery for a February 2020 quadruple murder in Indianapolis. All three defendants appealed, and this Court has issued opinions for two of the defendants.

In this appeal, Cameron Banks first argues the trial court erred in admitting incriminating evidence found during the search of his cell phone because the warrant was not supported by probable cause and violated the Fourth Amendment's particularity requirement. We find the search warrant was supported by probable cause as the affidavit presents facts, together with reasonable inferences, demonstrating a sufficient nexus between Cameron's cell phone and the shootings and robbery. We further find that the warrant was specific enough as it allowed the police to look for items that were related to the February 2020 shootings and robbery.

Cameron also argues the trial court erred in denying his motion for mistrial based on police officers approaching and standing behind him as the jurors filed out of the courtroom at the end of trial one day. As we did in a co-defendant's appeal, we find no error here.

Finally, Cameron argues the evidence is insufficient to support four separate robbery convictions because he did not take property from each victim. We find that Cameron was entitled to have three of his Level 2 felony robbery

convictions vacated. We also reduce the remaining Level 2 felony robbery conviction to a Level 5 felony based on double jeopardy.

## Facts and Procedural History

[4] In February 2020, nineteen-year-old Jalen Roberts and twenty-year-old Marcel Wills lived at Carriage House East Apartments at 42nd Street and Mitthoeffer Road on the east side of Indianapolis. Marcel owned guns and sold marijuana. On the night of February 5, twenty-one-year-old Braxton Ford and twenty-one-year-old Kimari Hunt, who was Marcel's girlfriend, were at the apartment with Jalen and Marcel.

[5] Shortly after 10 p.m., the police started receiving 911 calls about shots fired at Carriage House East. Officers from the Indianapolis Metropolitan Police Department responded to Jalen and Marcel's apartment and found the bodies of Jalen, Marcel, Braxton, and Kimari inside. Jalen had been shot twenty-nine times, Marcel and Braxton had been shot seven times each, and Kimari had been shot five times. It looked like the apartment had been "ransacked," and Marcel's guns and marijuana were missing. Tr. Vol. IV p. 182.

[6] About thirty minutes before the shootings, Anton Wilson and his younger brother, Mikalus Hervey, drove to Jalen and Marcel's apartment. Anton and Mikalus have another brother, Malique Hervey, who knew the victims and frequently stayed at Jalen and Marcel's apartment, but Malique was not with them at the time. Anton went inside while Mikalus, who was on the phone, stayed in the car. Anton was inside the apartment when three males entered.

Anton didn't know who they were, but he could tell that Jalen and Marcel did. Anton noticed that one of the males had a rose tattoo on his hand and a gun at his waist. The male was acting "jittery" and pacing around. Tr. Vol. III p. 171. Marcel asked the male why he was acting that way, but the male didn't respond. Marcel also asked the male if he wanted him to buy back the gun he had sold him, and the male responded that it would cost more because he had modified it. The situation made Anton feel "uncomfortable," so he told Marcel that he was leaving and would see him later. *Id.* at 172.

[7] Anton walked out of the apartment around 10 p.m. When Anton got back to his car, he saw that the male with the rose tattoo had left the apartment, walked over to a gold car in the parking lot that had its engine running, spoke to the person sitting in the driver's seat, and then returned to the apartment. Anton and his brother left.

[8] Later that night, Anton heard that there had been a shooting at Carriage House East. He called the police and spoke to the detective assigned to the case, Detective David Miller. Anton told Detective Miller about the three males he had seen at the apartment earlier that night but that he didn't know their names. After talking to Detective Miller, Anton went on Facebook to try to identify the three males.

[9] Meanwhile, Detective Miller obtained surveillance footage from Carriage House East and was able to determine the license-plate number of the gold car (an Oldsmobile), which was registered to nineteen-year-old Rodreice Anderson.

Detective Miller met with Anton on February 10, and Anton showed him what he had found on Facebook. Detective Miller then had three photo arrays prepared and showed them to Anton. Anton identified the three males he had seen at the apartment as nineteen-year-old Lasean Watkins, nineteen-year-old Cameron Banks, and sixteen-year-old Desmond Banks (Cameron's brother).

[10] The police picked up Rodreice on February 13 and brought him in for questioning. At first, Rodreice didn't tell the truth about where he was on February 5. Detective Miller showed Rodreice photos from Rodreice's public Facebook page, one of which was of him and Cameron. Rodreice eventually admitted that he was with Lasean, Cameron, and Desmond on the night of the shootings and that Lasean, Cameron, and Desmond went inside the apartment. Rodreice was arrested, and his cell phone was secured until a search warrant could be obtained.

[11] On February 14, the police picked up Cameron and Desmond and brought them in for questioning. Cameron had a black iPhone on his person, and the police secured it until a search warrant could be obtained. The next day, Detective Miller filed a twenty-one-page affidavit seeking a warrant to search Cameron's phone. This was one of thirty-seven search warrants that Detective Miller applied for in connection with this case. Tr. Vol. V p. 158. The affidavit detailed the course of the investigation up to that point. The affidavit also contained boilerplate language about the types of information that can be found on cell phones, such as Contacts, Call Logs, Web Browser Data, Messages,

Email, Location Information, Photos, and Videos. Appellant's App. Vol. III pp. 111-13. At the end of the affidavit, Detective Miller made the following request:

> This affiant respectfully requests that this court issue a search warrant authorizing the forensic examination of the above listed mobile device(s), and any identity modules and/or removable media contained therein, using the above described mobile device forensic methods, for the following:
>
> > All data which is relevant to and/or evidence of the crimes of murder and robbery specific to the above described investigation.

*Id.* at 114. The trial court issued a warrant to search Cameron's phone. *Id.* at 115-16.

[12] A forensic examination of Cameron's cell phone revealed that about four hours after the shootings, the phone was used to search the internet for "carriage house indianapolis surveillance." Tr. Vol. VI pp. 190-93; Ex. 447. A couple of hours later, the phone was used to search the internet for terms related to guns and ammunition. Tr. Vol. VI pp. 193-95; Ex. 447. Cameron's phone also contained several photographs and videos of him, Desmond, and Lasean posing and dancing with guns and drugs. Ex. 449. One of the photos was taken less than thirty minutes after the shootings. Tr. Vol. VI p. 203; Ex. 449.

[13] The State charged Lasean, Cameron, and Desmond each with four counts of murder, four counts of felony murder, and four counts of Level 2 felony robbery (enhanced from a Level 5 felony due to serious bodily injury). The State also

charged Rodreice with four counts of felony murder and four counts of Level 2 felony robbery. Rodreice and the State entered into a plea agreement, under which Rodreice would plead guilty to the four counts of Level 2 felony robbery and the State would dismiss the four counts of felony murder. Rodreice, who agreed to testify against Lasean, Cameron, and Desmond, was sentenced to thirty-five years, with five years suspended to probation.

[14]    In October 2022, Cameron moved to suppress the evidence found during the search of his cell phone. Appellant's App. Vol. III p. 69. Cameron argued the search warrant was not supported by probable cause and "lacked constitutionally required particularity." *Id.* at 80. The court denied the motion to suppress in January 2023. Tr. Vol. II p. 89.

[15]    A five-day jury trial was held in February and March 2023. Lasean, Cameron, and Desmond were tried together. A firearms expert testified that three different guns were used in the shootings. Anton testified as detailed above. Rodreice testified that Lasean called him on February 5 and asked for a ride. When Rodreice arrived at Lasean's house, Cameron and Desmond were with Lasean. The three got into Rodreice's gold Oldsmobile, and Lasean instructed Rodreice to drive them to Jalen and Marcel's apartment so they could buy marijuana. During the drive to Carriage House East, Lasean used Rodreice's phone to contact Jalen. When the group arrived at Carriage House East shortly before 10 p.m., Rodreice stayed in his car, which was running, while the other three went inside. Rodreice testified that at some point, Lasean left the apartment and walked over to him in his car. Lasean asked Rodreice if he had change for a

$20, and he said no. According to Rodreice, Lasean told him there were "four people in the house" and he was "about to rob them." Tr. Vol. V p. 38. Rodreice stayed in his car. Rodreice testified that soon after Lasean went back inside the apartment, he heard gunshots and moved his car in the parking lot so that it was closer to the street. About five minutes later, Cameron got in the car shortly followed by Desmond and Lasean. Each carried a gun and a duffel bag. Rodreice drove them to Cameron and Desmond's house, and Cameron gave Rodreice a jar of marijuana.

[16] At the end of the second day of trial, the trial court was giving the jurors instructions for the night when it appeared that a spectator in the gallery started talking to the defendants or the attorneys. Ex. 3. Cameron and Desmond turned around, and a Marion County Sheriff's Office deputy walked toward the gallery and directed the spectator to exit the courtroom. *Id.* After the trial court said "all rise" and as the jurors started filing out of the courtroom, three members of the Marion County Sheriff's Office Critical Emergency Response Team (CERT), who had been stationed in the courtroom during the trial, approached Cameron and Desmond and stood behind them.[1] *Id.* The CERT members, who were wearing special uniforms that resembled SWAT uniforms, told Desmond and Cameron to face forward. Desmond's attorney moved for a mistrial:

---

[1] In his brief, Cameron says one of the CERT members tapped his chair to get him to stand up. But the video of the incident (Exhibit 3) appears to show that Cameron and Desmond stood up **before** the CERT members approached them.

I'm moving for a mistrial. While the jury was in the room and standing up and proceeding towards the door, members of the CERT Team came and stood behind our clients, which gives the impression that our clients are in custody and essentially supervised by the Sheriff's Office. The jurors could, and very likely would, have seen that. And that's completely inappropriate and prejudicial to our clients.

And earlier I may have said removing. They -- they not necessarily were taking them out the door, but they were standing behind them in order to take them back into the lockup, and the jurors would've seen them standing behind them like that. And I think that's just unduly prejudicial, and the jurors shouldn't have seen that, and so we should have a mistrial.

Tr. Vol. IV pp. 105-06. Cameron's attorney joined in the motion, adding that the CERT members' presence behind Cameron and Desmond "g[ave] the impression that they [were] dangerous." *Id.* at 106. After reviewing a video of the incident and speaking at length with the parties, the court denied the motion for mistrial. The court detailed that the video showed that the CERT members stood behind Cameron and Desmond as the jurors filed out of the courtroom. The court explained that had the CERT members led Cameron and Desmond out of the courtroom while the jurors were still present, "that would be a much different situation." *Id.* at 111. The court emphasized that the situation was precipitated by the spectator in the gallery who tried to communicate with someone at the front of the courtroom. Nevertheless, it instructed the CERT members not to approach Cameron and Desmond anymore "until the jury is out of the room." *Id.*

[17] After the trial, the jury found Lasean, Cameron, and Desmond guilty as charged. Cameron and Desmond had a joint sentencing hearing, which was held before Lasean's. As to Cameron and Desmond, the trial court entered judgment of conviction for the four murder counts, vacated the four felony-murder counts, and entered judgment of conviction for the four counts of Level 2 felony robbery. The trial court sentenced them to fifty-five years for each murder conviction, to be served consecutively, and seventeen-and-a-half years for each robbery conviction, to be served concurrently, for a total of 220 years.

[18] At Lasean's sentencing hearing, the trial court similarly entered judgment of conviction for the four murder counts and vacated the four felony-murder counts. However, the court entered judgment of conviction for four counts of robbery as a Level 5 felony, which were reduced from a Level 2 felony due to double jeopardy. The court sentenced Watkins to sixty years for each murder conviction, to be served consecutively, and four years for each robbery conviction, to be served concurrently, for a total of 240 years.

[19] All three defendants appealed to this Court. We decided Lasean's and Desmond's appeals first. In his appeal, Lasean raised one issue, that is, whether the evidence was sufficient to prove that he was one of the participants. *See Watkins v. State*, No. 23A-CR-1109 (Ind. Ct. App. Dec. 14, 2023) (mem.), *trans. not sought*. We found the evidence was sufficient and affirmed. Desmond raised four issues, including two of the issues that Cameron now raises: (1) the trial court erred in denying the motion for mistrial based on the CERT members approaching and standing behind him as the jurors filed out of the courtroom

and (2) the evidence is insufficient to support four separate convictions for Level 2 felony robbery because he did not take property from each victim. *Desmond Banks v. State*, No. 23A-CR-896, 2024 WL 561388 (Ind. Ct. App. Feb. 13, 2024). We found no error in the denial of the motion for mistrial but that Desmond was entitled to have three of his Level 2 felony robbery convictions vacated. We also reduced the remaining Level 2 felony robbery conviction to a Level 5 felony based on double jeopardy.

[20] Cameron's appeal is now before us.

## Discussion and Decision

### I. The search warrant did not violate the Fourth Amendment

[21] Cameron contends the trial court erred in admitting the evidence found during the search of his cell phone because the warrant was obtained in violation of the Fourth Amendment.[2] While rulings on the admissibility of evidence are generally reviewed for an abuse of discretion, when a challenge to such a ruling is based on the constitutionality of a search or seizure, our review is de novo. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2007).

---

[2] Although Cameron cites Article 1, Section 11 of the Indiana Constitution, he does not present a separate analysis under it. We therefore address the Fourth Amendment only.

### A. The search warrant was supported by probable cause

Cameron argues the search warrant was invalid because it wasn't supported by probable cause. According to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." Probable cause is a fluid concept incapable of precise definition and is to be decided based on the facts of each case. *Carter v. State*, 105 N.E.3d 1121, 1127 (Ind. Ct. App. 2018), *trans. denied*. In determining whether a police officer's affidavit sets forth probable cause to issue a search warrant, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* at 1127-28. "Put differently, the central question in a probable cause determination is whether the affidavit presents facts, together with reasonable inferences, demonstrating a sufficient nexus between the suspected criminal activity and the specific place to be searched." *Id.* at 1128. "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." *State v. Stone*, 151 N.E.3d 815, 818-19 (Ind. Ct. App. 2020) (quotations omitted), *trans. denied*.

When a search warrant is sought for a cell phone, the affidavit must allege more than just the fact that the person who is suspected of criminal activity has a cell phone. As other courts have explained, affidavits that rely on the ubiquitous presence of cell phones and text messaging in daily life are insufficient to

establish the required nexus. *See Commonwealth v. Henley*, 171 N.E.3d 1085, 1109 (Mass. 2021). Instead, "there must be specific, not speculative, evidence linking the device in question to the criminal conduct." *Id.* (quotation omitted).

[24] Cameron asserts that "Detective Miller's affidavit makes no effort to demonstrate a nexus between the offenses [he] had been arrested for and his cell phone" and that he just listed "the scope and variety of information that cell phones contain generally." Appellant's Br. pp. 23-24. It is true that Detective Miller's affidavit contains several pages of boilerplate language about the categories of information that are generally found on cell phones, such as the following:

> Web Browser Data -- This includes bookmarks and web browser history. Bookmarks are websites that are sometimes saved by default or entered by a user to provide[] easier access to their bookmarked websites. Web browser history is documentation of Websites visited.
>
> Messages -- This includes Short Message Service (SMS) messages, commonly referred to as "text messages", Multimedia Messages (MMS), instant messages, and chat messages. Through a mobile device's native messaging applications, as well as third-party applications, a user has the ability to send and receive messages containing text, audio, video, and photos. Most smart phones also have the ability to capture screenshots of what is displayed on the screen and save it as an image. It is common to find screenshot images of messages stored on mobile devices.

*     *     *     *

Location information -- This includes Global Positioning System (GPS) data associated with metadata in photo and video files, and databases from applications that use GPS data in their operation. This location information can also come from cellular towers and Wi-Fi networks with which the device has interacted.

Photos -- Images stored on the mobile device or external storage. This includes images captured by the device, sent and received in messages, downloaded, transferred from other devices, screenshots captured of the device's display, and other images created on the device through the user's device usage. In addition to photos related to criminal activity, it is common to find photos commonly referred to as "selfies" in which the user takes an image of themselves. These images can assist in identifying the user of the device.

Videos -- Video movie files captured by the device or received from other sources. Like photos, these can often assist in identifying the user of the device.

Appellant's App. Vol. III pp. 111-12. Such boilerplate language, by itself, is not sufficient to establish probable cause. *See State v. Baldwin*, 664 S.W.3d 122, 123 (Tex. Crim. App. 2022) ("We hold that boilerplate language may be used in an affidavit for the search of a cell phone, but to support probable cause, the language must be coupled with other facts and reasonable inferences that establish a nexus between the device and the offense."), *reh'g denied*, *cert. denied*. Here, however, the boilerplate language is coupled with other facts potentially linking Cameron's cell phone to the crimes.

[25] The affidavit begins by stating that when the police arrived at the apartment, four victims were dead, the house had been ransacked, and guns and drugs

were missing. The affidavit sets forth a timeline of events constructed from video footage from Carriage House East's surveillance system, including when a gold Oldsmobile arrived and left the apartment and when three males got out of and then back in the car. The affidavit also details what Anton told Detective Miller, including what he found on Facebook to help him identify the three males he had seen at the apartment and that he eventually identified them in photo arrays as Lasean, Cameron, and Desmond. Anton also told Detective Miller that one of them had been texting his brother, Malique, since the shootings.

[26] According to the affidavit, Detective Miller then interviewed Malique, who confirmed that he and Lasean had been texting each other. Malique explained that it was common for Lasean to use other people's cell phones as well as other people's hotspots so he could send messages from his own phone. According to the text messages provided by Malique, a couple of hours after the shootings Malique texted Lasean and asked him if he was at the apartment around the time of the shootings. Lasean said he was there earlier that evening but not at the time of the shootings. In addition, Lasean said he used a friend's phone to call Jalen around 8:45 p.m., but Jalen didn't answer. He provided a screenshot showing the call to Jalen. Lasean also asked Malique what the police were asking him about the shootings. Eventually, Lasean texted Malique that his friend was turning off his hotspot so if Malique needed to get a hold of him he should call his friend's phone. Finally, Malique gave Detective Miller a photo from Facebook of Rodreice, Cameron, and Desmond.

The affidavit also details what Detective Miller learned during his investigation of Rodreice. On Rodreice's public Facebook page, Detective Miller found a photo of Rodreice and Cameron as well as photos of Rodreice and his friends with firearms. Lasean's Facebook profile "liked" several of Rodreice's photos. When Rodreice was brought in for questioning, he ultimately admitted his involvement in the shootings and explained that the group had discussed committing a robbery as they pulled into the parking lot at Carriage House East, his role was the getaway driver, and Lasean had used his phone to contact Jalen. According to the affidavit, a search warrant was obtained for Rodreice's cell phone, and the records showed that Jalen's phone called Rodreice's phone twice and Rodreice's phone texted Jalen's phone once shortly before the shootings. In addition, location data from Rodreice's phone showed that he was in the immediate vicinity of Carriage House East at the time of the shootings and at Cameron and Desmond's house at 10:30 p.m., less than thirty minutes after the shootings. A search warrant was obtained for Rodreice's house, and jars of marijuana and a loaded handgun magazine were found in his bedroom.

Finally, the affidavit details that Cameron and Desmond were brought in for questioning on February 14, and each of them talked separately with Detective Miller. When Cameron was asked where he was on February 5 around 10 p.m., he responded at home with his brother and mother. And when Desmond was asked where he was on February 5 around 10 p.m., he initially said he was at home but then said he was with Cameron smoking marijuana with someone named Phillip. After setting forth these and other facts in the affidavit,

Detective Miller asked for a warrant to search Cameron's cell phone for "All data which is relevant to and/or evidence of the crimes of murder and robbery specific to the above described investigation."

[29] We find that the affidavit presents facts, together with reasonable inferences, demonstrating a sufficient nexus between Cameron's cell phone and the shootings and robbery. First, the affidavit provides that Rodreice said the four of them discussed committing a robbery on their way to Carriage House East and that at least one of them contacted Jalen by phone right before the shootings. In addition, after the shootings Lasean texted Anton's brother, Malique, about the shootings and used someone else's phone and hotspot to do so. Because four people were involved in the planning and execution of the crimes and the police knew that phone communications related to the crimes had been occurring by some members of the group both before and after the shootings, it was reasonable to infer that Cameron's cell phone would unveil such communications as well. *See Henley*, 171 N.E.3d at 1109-10 ("It was reasonable to infer that [the defendant] was coordinating with a coconspirator to murder the victim for several reasons. . . . . The reasonable inference that [the defendant] used his cell phone to coordinate the murder follows logically. This evidence of likely coordination was sufficient to establish a nexus between the murder and [the defendant's] cell phone.").

[30] Second, the affidavit states that the police had some photos from Facebook that connected Rodreice, Lasean, Cameron, and Desmond to each other. On Rodreice's public Facebook page, Detective Miller found a photo of Rodreice

and Cameron as well as photos of Rodreice and his friends with firearms. Lasean's Facebook profile "liked" several of Rodreice's photos. In addition, Malique gave Detective Miller a photo from Facebook of Rodreice, Cameron, and Desmond. Based on these photos—at least two of which depicted Cameron with another member of the group—it was reasonable to infer that Cameron's cell phone would contain photos or videos linking him to the others or to the shootings and robbery.

[31]  Lastly, the affidavit provides that when Detective Miller asked Cameron where he was on February 5 around 10 p.m., he responded at home with his brother and mother. Location data from Rodreice's phone showed that he was in the immediate vicinity of Carriage House East at the time of the shootings and at Cameron and Desmond's house at 10:30 p.m., less than thirty minutes after the shootings. It was reasonable to infer that Cameron's cell phone would likewise contain location data of his whereabouts at the time of the shootings.

[32]  Even assuming the issue of probable cause was a close call, as noted above, doubtful cases are to be resolved in favor of upholding warrants. *Stone*, 151 N.E.3d at 818-19. Accordingly, we find that the search warrant was supported by probable cause.[3]

---

[3] Cameron cites three cases to support his argument that the search warrant wasn't supported by probable cause. *See Buckham v. State*, 185 A.3d 1 (Del. 2010); *Baldwin*, 664 S.W.2d 122; *United States v. Oglesby*, 2019 WL 1877228 (S.D. Tex. 2019). Again, probable cause is based on the facts of each case. Because of the facts detailed above that potentially link Cameron's cell phone to the shootings and robbery, which are not present in those cases, we find they do not control the outcome here.

## B. The search warrant satisfied the particularity requirement

[33] Cameron also argues the search warrant, which allowed the police to search his cell phone for "[a]ll data which is relevant to and/or evidence of the crimes of murder and robbery specific to the above described investigation," Appellant's App. Vol. III p. 115, was invalid because it was "an impermissible general warrant," Appellant's Br. p. 30. According to the Fourth Amendment, search warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." "Although the warrant must describe 'with some specificity' where officers are to search and what they are to seize, there is no requirement that there be an exact description." *Carter*, 105 N.E.3d at 1129 (quotation omitted). "Nonetheless, the warrant must be specific enough so that officers can, with reasonable effort, ascertain the place to be searched and the items to be seized." *Id.* (quotation omitted). "Ultimately, the description in a search warrant should be as particular as circumstances permit." *Price v. State*, 119 N.E.3d 212, 224 (Ind. Ct. App. 2019) (quotations omitted), *trans. denied*.

[34] Cell phones are, of course, unique because of their immense storage capacity and the variety of information they can contain. *See Riley v. California*, 573 U.S. 373 (2014). The United States Court of Appeals for the Seventh Circuit addressed whether a warrant to search a cell phone violated the Fourth Amendment's particularity requirement in *United States v. Bishop*, 910 F.3d 335 (7th Cir. 2018), *cert. denied*. There, the defendant was charged with discharging a firearm during a drug transaction, and a warrant was issued authorizing the search of his cell phone for the following:

**[A]ny evidence** (including all photos, videos, and/or any other digital files, including removable memory cards) of suspect identity, motive, scheme/plan along with DNA evidence of the crime of Criminal Recklessness with a deadly weapon which is hidden or secreted [in the cellphone or] **related to the offense of Dealing illegal drugs.**

*Id.* at 336 (emphases added). The defendant argued the search warrant was too general "because it authorized the police to rummage through every application and file on the phone and left to the officers' judgment the decision which files met the description." *Id.* The Seventh Circuit disagreed:

[The defendant] is right about the facts. This warrant *does* permit the police to look at every file on his phone and decide which files satisfy the description. But he is wrong to think that this makes a warrant too general. Criminals don't advertise where they keep evidence. A warrant authorizing a search of a house for drugs permits the police to search everywhere in the house, because "everywhere" is where the contraband may be hidden. And a warrant authorizing a search for documents that will prove a crime may authorize a search of every document the suspect has, because any of them might supply evidence.

\* \* \* \*

Just so with this warrant. It permits the search of every document on the cell phone, which (like a computer) serves the same function as . . . filing cabinets . . . . *See Riley v. California*, 573 U.S. 373 (2014). And as with filing cabinets, the incriminating evidence may be in any file or folder. That's why courts routinely conclude that warrants with wording similar to the one at issue here are valid. *See, e.g.*, *Archer v. Chisholm*, 870 F.3d 603, 616 (7th Cir. 2017); *United States v. Hall*, 142 F.3d 988, 996-97 (7th Cir.

1998); Wayne R. LaFave, 2 *Search & Seizure* § 4.6(d) (5th ed. 2012 & Supp. 2018) (citing many other cases). **It is enough, these decisions hold, if the warrant cabins the things being looked for by stating what crime is under investigation.**

*Id.* at 336-37 (emphasis added, citations omitted).

[35] The court explained that "specificity" is a "relative matter" and that a warrant is "too general" "only if some more-specific alternative would have done better at protecting privacy while still permitting legitimate investigation." *Id.* at 337. As an example, the court posited that if the police were looking for a particular paper and they knew what filing cabinet it was in, the failure to identify that cabinet in the warrant would violate the particularity requirement. *Id.* at 337-38. But if the police didn't know where the paper was, then broad language would suffice, as "a warrant need not be more specific than knowledge allows." *Id.* at 338. The court concluded that because the police didn't know where on his phone the defendant "kept his drug ledgers and gun videos," the warrant was as specific as circumstances allowed. *Id.*; *see also Carter*, 105 N.E.3d at 1130 (finding that a warrant specifically described the place to be searched—the cell phone recovered from the defendant—and what the police could search for— "any information relating to calls, messages, including Facebook messages and accounts" in connection to the defendant's drug dealing as set forth in the probable-cause affidavit); *Price v. State*, 119 N.E.3d 212, 225-26 (Ind. Ct. App. 2019) (finding that a warrant specifically described the place to be searched— the defendant's cell phone—and what the police could search for—"electronic

data and intellectual content" related to the suspicious death of the defendant's five-year-old child as testified to at the probable-cause hearing), *trans. denied*.

[36] Cameron cites *Burns v. United States*, 235 A.3d 758 (D.C. 2020). There, the defendant was charged with murdering his friend. The police sought a warrant to search the defendant's two cell phones. In the supporting affidavit, the police detailed that the defendant said during an interview that he and the victim had exchanged text messages throughout the day of the shooting until 7:30 p.m., when the defendant left his apartment and didn't return until the next day (at which point he found the victim dead inside). The affidavit also detailed that the defendant's cousin claimed to have spoken with the defendant on the phone the night of the shooting. Warrants were issued to search the defendant's cell phones for "any evidence related to the aforementioned homicide" and "any information recording the owner/possessor's schedule or travel or location" between two specific dates. *Id.* at 769. The court found that the warrants were overbroad:

> We conclude as a matter of law that the search warrants for [the defendant's] cell phones did not satisfy the requirements of the Warrant Clause. The facts set forth in the warrants' supporting affidavits established probable cause to believe the phones contained text messages between [the defendant] and [the victim] on November 14, 2015 and a log showing the precise time of the telephone call [the defendant] reportedly made to his cousin . . . that night. The facts alleged in the affidavits also supplied probable cause to support a search of the GPS tracking features on the phones to determine [the defendant's] whereabouts at pertinent times on November 14 and 15, 2015. But beyond those discrete items, the affidavits stated no facts that even arguably

provided a reason to believe that any other information or data on the phones had any nexus to the investigation of [the victim's] death.

*Id.* at 774.

[37] The court acknowledged the Seventh Circuit's opinion in *Bishop* but found that it was distinguishable. Specifically, the court highlighted that *Bishop* (and other cases cited by the government) "arose in circumstances in which the affidavits submitted in support of the warrants made robust showings of probable cause for a range of relevant evidence likely to be contained within the phones' data, without a way of knowing in advance precisely where within that data the evidence would be found." *Id.* at 776.

[38] This case is more like *Bishop*. As in *Bishop*, the police didn't know a specific area of Cameron's cell phone to search. At that early stage of the investigation, the police had four suspects—Rodreice, Lasean, Cameron, and Desmond—and were looking for evidence connecting Cameron to the other suspects and to the shootings and robbery. They knew that at least one of the suspects had been communicating with a victim right before the shootings and with another person shortly after the shootings and that there were Facebook photos showing some of the suspects together. The police also knew that Cameron claimed he was home at the time of the shootings but that Rodreice's phone records showed he was at Carriage House East. Because the warrant was as specific as the circumstances allowed and "cabined" the things to be looked for to

evidence of the February 5 shootings and robbery, the warrant did not violate the Fourth Amendment's particularity requirement.

[39] Because the search warrant was supported by probable cause and not an impermissible general warrant, the trial court did not err in admitting the evidence found during the search of Cameron's cell phone.

## II. The trial court properly denied Cameron's motion for mistrial based on the CERT members approaching and standing behind him as the jurors filed out of the courtroom

[40] Cameron contends the trial court erred in denying his motion for mistrial based on the CERT members approaching and standing behind him as the jurors filed out of the courtroom. "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). Because the trial court is in the best position to gauge the circumstances surrounding an event and its impact on the jury, we afford great deference to its decision on appeal. *Id.*

[41] Cameron says a mistrial was warranted because the CERT members' actions "created an unacceptable risk that the jurors would view [him] as being dangerous." Appellant's Br. p. 43. According to the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant "is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at

trial." *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quotation omitted). That does not mean, however, that "every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id.* Whenever a courtroom arrangement is challenged as inherently prejudicial, the question is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 569 (quotation omitted). "[T]he presence of armed personnel in a courtroom is not a practice that is inherently prejudicial and must be examined on a case-by-case basis." *Holifield v. State*, 572 N.E.2d 490, 496 (Ind. 1991) (citing *Holbrook*, 475 U.S. 560), *reh'g denied*; *see also Meadows v. State*, 785 N.E.2d 1112, 1123 (Ind. Ct. App. 2003) ("[W]hile several challenges have been made to uniformed officer presence in a courtroom, few cases have reached the conclusion that such police presence has resulted in an unacceptable risk to the defendant."), *trans. denied*.

[42] We first note that the trial court found, and Cameron does not challenge on appeal, that the CERT members' presence was required during trial. As we noted in Desmond's appeal, the CERT members were likely there for Lasean, who was facing another murder charge for killing an inmate while he was in jail awaiting trial. *See* Cause No. 49D31-2106-MR-17274.[4] Regardless, Cameron

---

[4] After Lasean was convicted in connection with the shootings and robbery, he pled guilty to Level 3 felony aggravated battery for killing the inmate and was sentenced to five years.

only challenges that the CERT members approached him and stood behind him as the jurors filed out of the courtroom.

[43] The CERT members' presence behind Cameron for a few moments did not result in an unacceptable risk of impermissible factors coming into play. As the trial court explained, the CERT members approached and stood behind Desmond and Cameron because of a unique sequence of events—one that evidently did not repeat itself. As Exhibit 3 shows, shortly before the CERT members approached Desmond and Cameron, a spectator in the gallery started talking to the defendants or the attorneys, and Desmond and Cameron turned around. As a sheriff's deputy removed the spectator from the courtroom, the CERT members approached Desmond and Cameron, stood behind them, and told them to face forward. The trial judge, who was present during this incident and reviewed the video, found that the CERT members approached and stood behind Desmond and Cameron as the jurors filed out of the courtroom but that Desmond and Cameron were not removed from the courtroom until after the last juror had left. Given our great deference to trial courts in ruling on requests for mistrial, *see Mickens*, 742 N.E.2d at 929, we cannot say the trial court abused its discretion here.

## III. The State concedes that three of the four robbery convictions should be vacated

[44] Cameron next contends the evidence is insufficient to support four separate convictions for Level 2 felony robbery because he did not take property from each victim. The State concedes that only one conviction for robbery is

appropriate (Count XII relating to Marcel) and that the other three convictions (Counts IX, X, and XI) should be vacated. We therefore reverse Cameron's convictions for Counts IX, X, and XI.

## IV. Cameron's convictions for the murder and Level 2 felony robbery of Marcel constitute double jeopardy, so we reduce the robbery to a Level 5 felony

[45] Although Cameron does not raise a double-jeopardy issue on appeal, we can raise double-jeopardy issues sua sponte. *See Koziski v. State*, 172 N.E.3d 338, 341 (Ind. Ct. App. 2021), *trans. denied*. It is especially appropriate to do so here because both of Cameron's co-defendants had their robbery convictions reduced to Level 5 felonies based on double jeopardy. In Lasean's case, his sentencing hearing was held after Desmond and Cameron's sentencing hearing. At that hearing, Lasean's attorney asked the trial court to enter judgment of conviction on robbery as a Level 5 felony due to double jeopardy. The court agreed and did so. In Desmond's case, he argued on appeal that his convictions for the murder and Level 2 felony robbery of Marcel constituted double jeopardy under *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), because the robbery was enhanced to a Level 2 felony due to the same serious bodily injury that formed the basis of the murder. The State responded that there was no double-jeopardy violation under *Wadle*. We noted, however, that the offenses occurred in February 2020, before *Wadle* was decided, and that under pre-*Wadle* law this was a clear double-jeopardy violation. *Desmond Banks*, 2024 WL 561388, at *5. Because Desmond was entitled to the benefit of the law that was in effect when

he committed the offenses, we reduced his Level 2 felony robbery conviction to a Level 5 felony. *Id.*

[46] We therefore reverse Cameron's conviction for the Level 2 felony robbery of Marcel (Count XII) and remand with instructions for the trial court to enter conviction for Level 5 felony robbery instead.

[47] Affirmed in part and reversed and remanded in part.

Altice, C.J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

Victoria Bailey Casanova
Casanova Legal Services, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana